IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEANDER LAND & LIVESTOCK,          Case No. 6:11-cv-06426-AA
INC.,                                  OPINION AND ORDER

        Plaintiff,

     v.

AMERICAN ECONOMY INSURANCE
COMPANY,

        Defendant.

_____

Steven C. Baldwin
Watkinson Laird Rubenstein Baldwin & Burgess, P.C.
101 E. Broadway, Suite 200
Eugene, Oregon 97401
     Attorney for plaintiff

John A. Bennett
Andrew E. Passmore
Bullivant Houser Bailey, P.C.
300 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon 97204
     Attorneys for defendant


Page 1 - OPINION AND ORDER

AIKEN, Chief Judge:

Defendant American Economy Insurance Company ("American") moves for summary judgment on plaintiff Leander Land & Livestock, Inc.'s ("Leander") breach of contract claim pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, American's motion is granted in part and denied in part.

## BACKGROUND

In 2007, Mary Sparacino incorporated Leander under Oregon law. William Hollingsworth, with whom Sparacino was romantically involved at all relevant times, assisted in the creation of Leander. In March 2008, Leander purchased a commercial property ("Building") located in North Bend, Oregon, for $425,000, from Exclusive Transport, Inc. Sparacino, the sole shareholder of Leander, was informed about the Building by Hollingsworth, whose sister was associated with Exclusive Transport, Inc. Hollingsworth was also renting an office from and living at the Building prior to its transfer to Leander.

In March 2009, Leander obtained an "Ultra Select Policy No. 02-BP-809149-1" ("Policy") from American, which insured Leander against any direct physical loss of or damage to the Building. In early May 2009, Leander listed the Building for sale for $550,000. On May 24, 2009, the Building was destroyed by a fire ("Fire") that was intentionally ignited by an unknown individual. Thereafter, Leander tendered a claim to American. After investigating the Fire, American denied Leander's claim based on the "Concealment, Misrepresentation or Fraud Provision" ("Misrepresentation Clause")

Page 2 - OPINION AND ORDER

and the "Vacancy Provisions" ("Vacancy Exception") of the Policy.

On November 28, 2011, Leander filed a contract claim in the Lane County Circuit Court, alleging that American's non-payment for Building damage caused by the Fire constituted breach of the Policy.  On December 30, 2011, American removed Leander's action to this Court.

## STANDARD

Summary judgment is appropriate if the pleadings, depositions, affidavits, answers to interrogatories, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Substantive law on an issue determines the materiality of a fact.  T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of a dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact are resolved against the moving

Page 3 - OPINION AND ORDER

party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## DISCUSSION

This dispute centers on whether damage to the Building from the Fire is covered under the Policy.

I.  Legal Standard for Insurance Policy Interpretation

The interpretation of an insurance policy is a question of law, to be determined by the court. Hoffman Constr. Co. v. Fred S. James & Co. of Or., 313 Or. 464, 469-71, 836 P.2d 703 (1992). In construing the meaning of an insurance policy, "[t]he primary and governing rule is to ascertain the intention of the parties." Id. at 469 (citation and internal quotations omitted). In so doing, the court examines the terms and conditions of the policy; undefined terms are given their ordinary and plain meaning. Groshong v. Mut. of Enumclaw Ins. Co., 329 Or. 303, 307-8, 985 P.2d 1284 (1999). Oregon courts refer to the dictionary when determining the ordinary and plain meaning of an undefined term in an insurance policy, except where that term has already been construed by a previous court; there, the court construes the disputed term consistent with relevant precedent. See Gonzales v. Farmers Ins. Co. of Or., 210 Or. App. 54, 60-5, 150 P.3d 20 (2006), aff'd, 345 Or. 382, 196 P.3d 1 (2008).

Where the disputed term has no plain meaning, "that is, if the term is ambiguous" because it is capable of more than one reasonable interpretation, the court "examine[s] that term within

Page 4 - OPINION AND ORDER

the context of the policy as a whole." <u>Dewsnup v. Farmers Ins. Co.</u> <u>of Or.</u>, 349 Or. 33, 40, 239 P.3d 493 (2010) (citation omitted). If, after examining the text and context of the policy, the disputed term remains ambiguous, the court then "construe[s] the term against the drafter and in favor of the insured." <u>Id.</u> (citation omitted).   Conversely, where the disputed term is unambiguous, it is enforced as written. <u>Groshong</u>, 329 Or. at 308.

II.  <u>Policy Terms</u>

The Policy provides coverage for damage due to certain "specified" or "covered" causes of loss, including "fire," "vandalism," "lightening," and "water damage."  Policy at 14, 16, 45.[1]  The Vacancy Exception, however, precludes coverage for damage caused by the following events where the property has been vacant for more than 60 consecutive days prior to that damage: "(a) Vandalism; (b) Sprinkler leakage, unless you have protected the system against freezing; (c) Building glass breakage; (d) Water damage; (e) Theft; or (f) Attempted theft." <u>Id.</u> at 39.  Coverage for any other damage that occurs in a building that meets the 60-day vacancy requirement is reduced by 15% of "the amount [American] would otherwise pay." <u>Id.</u>

A "building is vacant unless 31% of its total square footage is [r]ented to a lessee or sublessee and used by the lessee or

---

[1] Citations are numerically consistent with the complete copy of the Policy that American produced at the Court's request.

sublessee to conduct its customary operations; and/or [u]sed by the building owner to conduct customary operations"; however, "[b]uildings under construction or renovation are not considered vacant."    Id.    Neither "vandalism," "construction," nor "renovation" are defined within the Policy. See generally id.

In addition, under the Misrepresentation Clause, the Policy is void where, "whether before or after a loss, [the insured] willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject of it, or [the insured's] interest in it, or in case of any fraud or false swearing by [the insured] relating to it." Id. at 69.

III. Analysis

American contends that the Vacancy Exception applies, thereby foreclosing coverage under the Policy, because the Building was vacant for at least 60 days prior to the Fire. Further, American asserts that the term "vandalism," as it is used within the Policy, encompasses intentionally ignited fires. Conversely, Leander argues that summary judgment is inappropriate because genuine issues of material fact exist regarding whether the Building had tenants. Leander also contends that the term "vandalism" has a meaning distinct from arson and, moreover, the "list of exclusions under the [Vacancy Exception] was extensive and if [American] intended to exclude arson from payment for loss or damage caused, it surely knew how to and could have easily done so." Pl.'s Resp. to Mot. Summ. J. 4-5.

As a preliminary matter, the Court notes that, while coverage was denied primary due to Sparacino's and Hollingsworth's alleged "material misrepresentations and conceal[ment] of material facts in the presentation of Leander's claims," American does not move for summary judgment pursuant to the Misrepresentation Clause. Bennett Decl. in Supp. of Mot. Summ. J. ("First Bennett Decl.") Ex. E, at 1. As such, the construction and application of the Vacancy Exception may not resolve the parties' dispute in full, as independent, alternate grounds, which are not at issue here, may exist for the denial of Leander's claim.

A.    Whether the Building was Vacant Prior to the Fire

On April 7, 2010, American deposed Sparacino. See First Bennett Decl. Ex. A. During the deposition, Sparacino was represented by counsel and was expressly notified that she "must give truthful answers . . . under oath" because a "false answer or misrepresentation or conceal[ment] may nullify coverage under [the Policy]" and any "contrary testimony . . . could be used against [her] at trial." Id. at 3, 5-7.

Sparacino testified that, prior to purchasing the Building, she had never invested in any property, commercial or otherwise, and "can't really say" what motivated her to get involved in buying and selling real estate. Id. at 8. Sparacino clarified, however, that her business plan for Leander was to invest in a commercial building "to turn around and sell it and make maybe five, ten thousand." Id. at 9. Sparacino then provided testimony regarding

who was occupying the Building prior to Leander's acquisition of it in March 2008:

> Q: So when you visited the building, [d]id you ever see any other people in the building besides Mr. Hollingsworth?
>
> A: No.
>
> Q: Did Mr. Hollingsworth ever tell you, prior to January 2008, that any other businesses were renting space within the building?
>
> A: No.
>
> Q: So prior to January 2008, there were no tenants in the building to your knowledge?
>
> A. No.  There's no tenants.
>
> Q: Okay.  It was just Mr. Hollingsworth?
>
> A: Yes . . .
>
> Q: At [that] time[,] did Mr. Hollingsworth still have an office contained within the building at 1390 Airport Way?
>
> A: He was set up there, yes, he was. But as soon as I took over, I told him he couldn't have it. . .
>
> Q: Was there anyone else as a tenant in the building at the end of December 2007 or at the beginning of January 2008?
>
> A: No tenants.
>
> Q: So no one else was in there except Mr. Hollingsworth?
>
> A: Exactly . . .
>
> Q: Now, at the time that the property was for sale -- and we are talking early 2008 . . . It was, for all intents and purposes, a vacant building.
>
> A: Yes.

Id. at 23-26.

American also questioned Sparacino regarding who was occupying the Building and what it was being used for after Leander purchased it:

Page 8 - OPINION AND ORDER

> Q: After Leander Land purchased the property, [d]id [Hollingsworth] help manage property?
>
> A: Yeah. But I didn't pay him.
>
> Q: Did he pay you -- did he pay you to use the property in any way?
>
> A: No.
>
> Q: Was there ever an arrangement that he would pay rent to you or that rent would be forgiven because he was doing work on the property for you?
>
> A: No.
>
> Q: Do you know how often Mr. Hollingsworth went out to the property after Leander Land purchased it?
>
> A: On a regular basis . . . Couple of times a week.
>
> Q: Did he use the space for any of his own businesses?
>
> A: No.  Not after I purchased it . . .
>
> Q: Did he allow anybody else to conduct business on the site?
>
> A: No . . .
>
> Q: Did you ever see any other individuals at the property besides Mr. Hollingsworth?
>
> A: Let's see.  No.

Id. at 29-31.

Finally, Sparacino delineated how the Building was configured

prior to the Fire:

> Q: When you went into the offices two weeks before the fire, [w]hy were there [three] computers in there?
>
> A: Well, they weren't set up . . . I had no internet or anything on them.
>
> Q: Were they just old computers?
>
> A: Not real old.  It was to make a good appearance when it sold.
>
> Q: [W]hen you bought the property from Exclusive Transport, did it come furnished with property?

Page 9 - OPINION AND ORDER

A: Yes, it did.

Id. at 32.

The above testimony reveals that the Building was vacant, as defined by the Policy, from at least January 2008 through the date of the Fire.    Nonetheless, Leander asserts that following its "purchase of the Building, existing tenants remained in a post-sale lease back agreement with Exclusive." Pl.'s Resp. to Mot. Summ. J. 3.    Moreover, Leander argues that Sparacino's April 2010 testimony does not establish that the building was vacant because: (1) her subsequent statements "clearly [do] not support this conclusion"; (2) she misunderstood the meaning of the term "tenant"; and (3) "[n]umerous individuals, not occupying the building nor invested in Leander's operations, have confirmed in their Affidavits that there were business activities and several occupants in the building during 2008, 2009, and in the weeks leading up to the fire." Id. at 3-4.

American asserts that Sparacino's inconsistent remarks under oath, including those set forth in her January 30, 2013 affidavit, should be disregarded pursuant to the sham affidavit rule.    In addition, American contends that Leander's remaining evidence does not preclude summary judgment because the "affidavits [from Hollingsworth, Christensen, and Yount] do nothing to establish that 31% of the building's total square footage was rented to a lessee conducting customary operations and/or used by Plaintiff to conduct customary operations." Def.'s Reply to Mot. Summ. J. 14.

i.   <u>Sparacino's Testimony</u>

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." <u>Kennedy v. Allied Mut. Ins. Co.</u>, 952 F.2d 262, 266 (9th Cir. 1991).   Thus, the sham affidavit doctrine prevents a party who has been examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradicting his or her own prior testimony, which would "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." <u>Id.</u> (citations and internal quotations omitted).   In order to trigger this rule, the district court must make a factual determination that the contradiction is a sham and "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." <u>Van Asdale v. Int'l Game Tech.</u>, 577 F.3d 989, 998-99 (9th Cir. 2009) (citation omitted).

Nevertheless, the sham affidavit rule should be applied with caution because it "is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence." <u>Id.</u> at 998.   As such, "newly-remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham." <u>Yeager v. Bowlin</u>, 693 F.3d 1076, 1081-82 (citing <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 806-07 (1999)).   In other words, "the non-moving party is

Page 11 - OPINION AND ORDER

not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." Messick v. Horizon Indus., 62 F.3d 1227, 1231 (9th Cir. 1995) (citing Kennedy, 952 F.2d at 266-67).

The record here contains four relevant sources that supplement Sparacino's April 2010 testimony: Sparacino's April 11, 2011 "Corrections to the EUO" ("Corrections"); Sparacino's September 9, 2011 deposition; Leander's interrogatory response, dated June 1, 2012; and Sparacino's January 30, 2013 affidavit. See Bennett Decl. in Supp. of Reply to Mot. Summ. J. ("Second Bennett Decl.") Exs. A, B, & E; Sparacino Decl. Ex. 1.

In her Corrections, Sparacino stated that she "did see a few other people" at the Building and that Hollingsworth "sometimes let the other companies using the Building and Yard in and out." Second Bennett Decl. Ex. A, at 3.  Sparacino also remarked that Hollingsworth "continued with [his] Exclusive Transport inc. [lease] agreement, same as the original companies did under whatever month to month they had" after Leander purchased the Building. Id.  During her September 9, 2011 deposition, Sparacino provided a list of 15 tenants that were allegedly in the Building prior to and throughout Leander's ownership. Id. at Exs. B & C. Sparacino testified further that Hollingsworth helped her prepare this list sometime between May 2009 and March 2010 and, as such,

Page 12 - OPINION AND ORDER

she understood that the entities recorded therein were tenants at the time of her April 2010 deposition. <u>Id.</u> at Ex. B, at 5-6.

On June 1, 2012, Leander specified that there were only three "compan[ies], individual[s], and/or other entit[ies]" in the Building during "the calendar year of 2009." <u>Id.</u> at Ex. E, at 2-3. Lastly, in her January 30, 2013 affidavit, Sparacino again stated that "[t]he existing tenants remained in a Post-sale Lease back agreement with Exclusive Transport . . . for $5,000 per month." Sparacino Aff. Ex. 1, at ¶ 3.    She also reported that Leander maintained its corporate offices in the Building and concluded that the "Building and Yard has always been in use and occupied, up until its loss by fire on May 24, 2009." <u>Id.</u> at ¶¶ 4, 6 (emphasis omitted).

The Court finds that Sparacino's subsequent statements do not offer elucidation or explanation but, instead, directly contradict her April 2010 testimony.    Regardless of whether Sparacino misunderstood the term "tenant,"[2] her prior statements make clear

---

[2] Leander's response brief cites to two separate documents, entitled "Sparacino Corrections" and "Corrections to Mary Sparacino's EUO," in support of its contention that Sparacino did not understand the meaning of the term "tenant" as it was used at the April 2010 deposition; however, Leander failed to produce these materials. <u>See</u> Pl.'s Resp. to Mot. Summ. J. 3.    The Corrections excerpts that America produced omit reference to Sparacino's alleged misunderstanding. <u>See</u> Second Bennet Decl. Ex. A.    Hollingsworth's explanation, that "Sparacino believed the word 'Tenant' meant a person renting an apartment," contradicts Sparacino's September 2011 sworn statements and, while not dispositive, strains credulity given that the commercially-zoned Building does not contain any residential units. <u>Compare</u> Hollingsworth Aff. Ex. 1, <u>with</u> Second Bennett Decl. Ex. B, at 6; <u>see also</u> First Bennett Decl. Ex. A, at 15.

Page 13 - OPINION AND ORDER

that there were no other companies or individuals conducting
business at the Building. See First Bennett Decl. Ex. A, at 23-26.
Her April 2010 testimony also establishes that there were no other
individuals at the site for any other purpose and, to the extent
that the Building appeared to be operational office space, that was
only because it was staged as such for resale. Id. at 29-32.
Further, because Sparacino stated that her sole purpose in
purchasing the Building was to resell it at a profit, it is unclear
what "customary operations," if any, Leander was carrying out
therein. Id. at 8.

    Accordingly, the Court is unable to conclude that this is a
case in which the deponent's memory could credibly have been
refreshed by subsequent events, including discussions with others
or her review of documents, records, or papers. This is especially
true in light of Sparacino's September 2011 testimony that, at the
time of her April 2010 deposition, she understood that the entities
that were allegedly leasing space in the Building were tenants.
See Second Bennett Decl. Ex. B, at 5-6.    Rather, because no
explanation, reasonable or otherwise, was provided for the "clear
and unambiguous" inconsistencies between her January 2013 and April
2010 statements, the Court finds that Sparacino's affidavit is a
sham. Yeager, 693 F.3d at 1080-81. As such, Sparacino's January
2013 affidavit is stricken to the extent that it contradicts her
prior deposition testimony.

While American has not cited to, and the Court is not aware of, any precedent applying the sham affidavit rule to subsequent deposition testimony, corrections to deposition testimony, or interrogatories, the extension of this doctrine is appropriate in this case. Notably, Leander failed to introduce a single corroborating lease or contract arising out of or relating to any one of the alleged tenancies, despite the fact that Sparacino or Hollingsworth would undoubtedly have access to this information as owner and/or lessor of the Building. Similarly, aside from Sparacino's affidavit, Leander neglected to produce testimony from any of the individuals or entities that were allegedly leasing office space in the Building immediately preceding the Fire. Moreover, the Court notes that Sparacino's later remarks are replete with additional inconsistencies. For instance, in September 2011, Sparacino asserted that there were approximately 15 tenants, whereas in June 2012, Leander contended there were only three tenants, all of whom allegedly shared the same square footage and one of whom was not previously identified. Compare Second Bennet Decl. Exs. B & C, with id. at Ex. E, at 3-4. Thus, for the reasons discussed in regard to her affidavit, the Court finds the subsequent evidence from Sparacino regarding the Building's vacancy prior to the Fire is a sham and therefore stricken to the extent that it contravenes her April 2010 statements.

ii. <u>Testimony of Hollingsworth, Christensen, and Yount</u>

On motion for summary judgment, a conclusory affidavit, lacking detailed facts or any supporting evidence, is insufficient to create a genuine issue of material fact. <u>See</u> <u>Shakur v. Schriro</u>, 514 F.3d 878, 890 (9th Cir. 2008). Here, Yount testified that he lived near the Building and visited it "often"; he "was inside the building during the weeks and months prior to the fire on May 24, 2009 [and it] was occupied and furnished and being used as an office complex with several areas being used by the tenants and companies." Yount Aff. Ex. 1. Hollingsworth similarly stated that the Building "was fully furnished and was occupied and used as Office Space by several companies up to the date of its loss by fire on May 24, 2009." Hollingsworth Aff. Ex. 1; <u>see also</u> Second Bennett Decl. Ex. D, at 4 (Hollingsworth stating that those listed during Sparacino's September 2011 deposition "were the companies that were doing business during the period of time from the time the building was purchased [until it] was lost in a fire").

Further, Christensen testified that she "was at the building many times during 2008 and 2009 [and it was] being used as offices for several tenants including SPARACINO, who had her license displayed on the wall with a number of other companies who were using the premises." Christensen Aff. Ex. 1. Christensen also remarked that she "noticed various certificates on the wall and different people coming and going from the building and [there] were books, papers and mail about as is normal in any business

offices." Id. She concluded that "[a]t no time was the building vacant or not being used. The interior of the building was being cleaned, re-stained and painted[3] during April and the first part of May, 2009, to be shown to prospective buyers." Id.

Even when construed broadly, these affidavits do not demonstrate that the Building was occupied. The Policy defines occupancy narrowly; a property is considered not "vacant" only if "31% of its total square footage is [r]ented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or [u]sed by the building owner to conduct customary operations." Policy at 39. These affidavits, however, are silent as to whether the Building was being rented or used by a lessee, sublessee, or Leander to carry on customary operations. See generally Hollingsworth Aff. Ex. 1; Yount Aff. Ex. 1; Christensen Aff. Ex. 1. In addition, the testimony of Hollingsworth, Yount, and Christensen does not address how much of the Building was being rented or used by the individuals or companies that were observed on-site. Id. As such, there is no indication that 31% of the Building's total square footage was being used by the alleged tenants for their customary business operations.

---

[3] Although "[b]uildings under construction or renovation are not considered vacant," neither party raises the issue of whether the work done during April and May 2009 impacted the application of the Vacancy Exception. Policy at 39. The Court therefore presumes that it is undisputed that the work referred to in Christensen's affidavit did not trigger this clause.

Moreover, these affidavits are conclusory and often lack an adequate factual foundation. For example, Yount concluded that the Building was "being used by the tenants and companies." Yount Aff. Ex. 1. Likewise, Christensen concluded that "[a]t no time was the building vacant." Christensen Aff. Ex. 1. Yet Yount and Christensen did not recite any facts that support their conclusions. In other words, while each observed other people and business licenses on the premises, it does not necessarily or logically follow that the on-site individuals or entities were paying rent to use or occupy 31% of the Building. Id.; Yount Dec. Ex. 1. In fact, neither Hollingsworth, Yount, nor Christensen proffered any evidence to counter Sparacino's April 2010 statements that the Building was "vacant" within the meaning of the Policy and, as discussed above, there is no such evidence otherwise in the record. See, e.g., Fed. Trade Comm'n v. MacGregor, 360 Fed.Appx. 891, 893 (9th Cir. 2009) (affidavits, which consisted of the defendant's employees' statements that the defendant's companies did not violate the law, did not create a genuine issue of material fact because they were "conclusory" and "[a]ppellants did not proffer any survey data or other evidence to counter the FTC's evidence") (citing Fed. Trade. Comm'n v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997)).

Therefore, the Court finds that the affidavits of Hollingsworth, Yount, and Christensen do not create a genuine issue of material fact as to whether the Building was "vacant" within the meaning of the Policy. Accordingly, because Leander's claim that

Page 18 - OPINION AND ORDER

the Building was not vacant lacks support in the record, American's
motion for summary judgment is granted in this regard.

B.    Whether an Intentionally Set Fire Qualifies as Vandalism

It is undisputed that "Oregon courts have not addressed
whether an arson fire is considered 'vandalism' when the term is
undefined in the policy." Def.'s Mem. in Supp. of Mot. Summ. J.
16; see also Pl.'s Resp. to Mot. Summ. J. 5.   Where, as here,
neither the insurance policy nor Oregon law defines a critical
term, this Court's first task is to consider that term's plain
meaning within the context of the dispute.   The dictionary defines
"vandalism" as "[w]illful or malicious destruction of public or
private property." Webster's II New Riverside Univ. Dictionary 79
(1988).   As American notes, numerous courts from outside of this
Circuit or District "have relied on Webster's definition when
determining whether an arson fire constituted vandalism." Def.'s
Mem. in Supp. of Mot. Summ. J. 16 (citations omitted).

Nonetheless, as the parties acknowledge, there is a split in
authority regarding whether the use of the term "vandalism," as it
is defined in the dictionary and used within commercial insurance
policies, includes intentionally ignited fires.   Where the policies
at issue "involve named-peril coverage that expressly distinguishes
between 'fire' and 'vandalism,'" the majority of courts "agree
either that 'vandalism' unambiguously excludes arson or that the
term is ambiguous and must be construed against the insurer." R &
J Dev. Co., LLC v. Travelers Prop. Cas. Co. of Am., 2012 WL

1598088, *3 n.1 (E.D.Ky. May 7, 2012) (collecting cases). Conversely, where the policies at issue "did not enumerate or otherwise distinguish among causes of loss like 'fire' and 'vandalism'" courts generally "interpret 'vandalism' to include arson." Id. at n.2 (collecting cases).

Here, the term "vandalism," as it is used within the Policy, does not equate to an intentionally ignited fire for four reasons. First, despite American's ability to expressly exclude coverage for damage in vacant properties caused by fire or arson, the Vacancy Exception does not actually contain any such language. See Policy at 39. Second, regardless of the breadth of definitions found elsewhere, the structure and language of the Policy indicates that the terms "fire," "vandalism," and "arson" have independent meanings. Id. at 45 (referring to "fire" and "vandalism" as separate events in the definition of "specified causes of loss"); see also id. at 89 (American "will pay an Arson, Vandalism or Theft reward for information which leads to an arson, vandalism or theft conviction for loss or damage covered by this policy"). In other words, because the Policy plainly distinguishes between an intentionally or accidentally ignited fire and vandalism, the parties could not have intended the Vacancy Exclusion to unequivocally preclude coverage for property damage caused by arson. See, e.g., R & J Dev., 2012 WL 1598088 at *3 (citations omitted); see also Am. States Ins. Co. v. Rancho San Marcos Props., LLC, 123 Wash.App. 205, 209-212, 97 P.3d 775 (2004), rev. denied, 154 Wash.2d 1008, 114 P.3d 1198 (2005).

Page 20 - OPINION AND ORDER

Third, construing "vandalism" as synonymous with arson would render other portions of the Policy superfluous. For instance, if "vandalism" means any intentional property damage, then the medium of destruction is irrelevant and there would be no need for the Vacancy Exception to also exclude damage caused by "theft" or "attempted theft." See Policy at 39. Likewise, if "vandalism" and "arson" are imbued with the same meaning, there would be no need for the Policy to pay an "Arson, Vandalism or Theft award." Id. at 82 (emphasis added). Finally, American's imprecise drafting allows the term "vandalism" to have more than one reasonable interpretation. Accordingly, because American's and Leander's definitions are both plausible and equally supported by non-binding authority, this Court is required to construe the Policy in favor of coverage. See Dewsnup, 349 Or. at 40. Therefore, American's motion is denied as to this issue.

## CONCLUSION

American's motion for summary judgment (doc. 11) is GRANTED in part and DENIED in part as follows: GRANTED as to whether the Building was vacant for 60 days prior to the Fire; and DENIED in regard to whether damage caused by the Fire is excluded as "vandalism" under the Vacancy Exception.

IT IS SO ORDERED.
Dated this 21st of April 2013.

_____
Ann Aiken
United States District Judge

Page 21 - OPINION AND ORDER