IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| LEANDER LAND & LIVESTOCK, INC., | Case No. 6:11-cv-06426-AA<br>OPINION AND ORDER |
| Plaintiff, | |
| v. | |
| AMERICAN ECONOMY INSURANCE COMPANY, | |
| Defendant. | |

Leander Land & Livestock, Inc.
c/o Mary L. Sparacino
58400 Clifford Road
Bandon, Oregon 97411
    Pro se plaintiff

John A. Bennett
Andrew E. Passmore
Bullivant Houser Bailey, P.C.
300 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon 97204
    Attorneys for defendant

Page 1 - OPINION AND ORDER

AIKEN, Chief Judge:

Defendant American Economy Insurance Company ("American") filed a second motion for summary judgment on plaintiff Leander Land & Livestock, Inc.'s ("Leander") breach of contract claim pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, American's motion is granted and this case is dismissed.

## BACKGROUND

In 2007, Mary Sparacino incorporated Leander under Oregon law. William Hollingsworth, with whom Sparacino was romantically involved at all relevant times, assisted in the creation of Leander. In March 2008, Leander purchased a commercial property ("Building") located in North Bend, Oregon, for $425,000, from Exclusive Transport, Inc. Sparacino, the sole shareholder of Leander, was informed about the Building by Hollingsworth, whose sister was associated with Exclusive Transport, Inc. Hollingsworth was also renting an office from and living at the Building prior to its transfer to Leander.

In March 2009, Leander obtained an "Ultra Select Policy No. 02-BP-809149-1" ("Policy") from American, which insured Leander against any direct physical loss of or damage to the Building. In early May 2009, Leander listed the Building for sale for $550,000. On May 24, 2009, the Building was destroyed by a fire ("Fire") that was intentionally ignited by an unknown individual. Thereafter, Leander tendered a claim to American. After investigating the Fire, American denied Leander's claim based on the "Concealment,

Page 2 - OPINION AND ORDER

Misrepresentation or Fraud Provision" ("Misrepresentation Clause"[1]) and the "Vacancy Provisions" ("Vacancy Exception"[2]) of the Policy.

On November 28, 2011, Leander filed a contract claim in the Lane County Circuit Court, alleging that American's non-payment for Building damage caused by the Fire constituted breach of the Policy. On December 30, 2011, American removed Leander's action to this Court. On December 31, 2012, American moved for summary judgment under the Policy's Vacancy Exception. On March 7, 2012, the parties tried unsuccessfully to settle their case. On April 21, 2013, this Court granted in part and denied in part American's motion. In relevant part, the Court held that the Building was vacant for 60 days prior to the Fire; central to this determination was the Court's application of the sham affidavit rule to Sparacino's inconsistent sworn statements concerning Building tenancy.

On July 10, 2013, American filed a second motion for summary

---

[1] Under the Misrepresentation Clause, the Policy is void where, "whether before or after a loss, [the insured] willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject of it, or [the insured's] interest in it, or in case of any fraud or false swearing by [the insured] relating to it." Am. Passmore Decl Ex. B, at 8; see also Or. Rev. Stat. § 742.208.

[2] Pursuant to the Vacancy Exclusion, if the property was "vacant" for more than 60 consecutive days prior to damage caused by arson, coverage is reduced by 15% of "the amount [American] would otherwise pay." Am. Passmore Decl Ex. B, at 6; see also Leander Land & Livestock, Inc. v. Am. Econ. Ins. Co., 2013 WL 1786348, *8-9 (D.Or. Apr. 21, 2013). A "building is vacant unless 31% of its total square footage is [r]ented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or [u]sed by the building owner to conduct customary operations." Am. Passmore Decl Ex. B, at 6.

Page 3 - OPINION AND ORDER

judgment pursuant to the Misrepresentation Clause. On July 29, 2013, the parties stipulated to allow Leander additional time to oppose American's motion. On August 16, 2013, Leander's counsel moved to withdraw as attorney of record. On September 23, 2013, this Court granted counsel's motion to withdraw and extended the deadline for Leander to respond to American's motion until October 15, 2013, in order to allow Leander time to obtain new counsel if desired. As of the date of this decision, the court notes that Leander has neither filed an opposition to American's second motion for summary judgment nor procured substitute counsel. The court will therefore assume plaintiff intends to proceed pro se in this matter.

## STANDARD

Summary judgment is appropriate if the pleadings, depositions, affidavits, answers to interrogatories, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of a dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a

genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact are resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## DISCUSSION

American contends that the Misrepresentation Clause applies, thereby voiding the Policy, because "[a]t different times during the adjustment of the claim and this litigation, [Sparacino] has represented that the building had no tenants prior to the fire, had eighteen tenants prior to the fire, and had three tenants prior to the fire." Def.'s Mem. in Supp. of Second Mot. Summ. J. 10. As a result of Sparacino's alleged material misrepresentations, American asserts that it was required to spend additional time and resources investigating Leander's claim, such that it is now entitled to summary judgment.

"A misrepresentation after the loss as to a single material fact will forfeit the entire insurance contract." Henricksen v. Home Ins. Co., 237 Or. 539, 542 n.1, 392 P.2d 324 (1964) (citation omitted). Thus, in order to avoid coverage under both the Misrepresentation Clause and Oregon law, the insurer must establish, by a preponderance of the evidence, that: (1) the

Page 5 - OPINION AND ORDER

insured misrepresented or concealed a material fact; (2) the insured did so knowingly or recklessly; and (3) the insurer detrimentally relied on the misrepresentation or concealment. See Allstate Ins. Co. v. Breeden, 216 Fed.Appx. 655, 658 (9th Cir. 2007) (citing Or. Rev. Stat. § 742.208); Mut. of Enumclaw Ins. Co. v. McBride, 295 Or. 398, 400, 667 P.2d 494 (1983).

I.   Misrepresentation or Concealment of a Material Fact

The record contains four relevant and inconsistent sources of testimony from Sparacino regarding whether the Building was vacant prior to the Fire: the April 7, 2010 Examination Under Oath ("EUO"); the April 11, 2011 "Corrections to the EUO"; the September 9, 2011 EUO; and Leander's interrogatory response, dated June 1, 2012.

In April 2010, American deposed Sparacino. See Am. Passmore Decl. Ex. A. "During the deposition, Sparacino was represented by counsel and was expressly notified that she must give truthful answers under oath because a false answer or misrepresentation or concealment may nullify coverage under the Policy and any contrary testimony could be used against her at trial." Leander, 2013 WL 1786348 at *3 (citations and internal quotations omitted). In pertinent part, Sparacino provided testimony regarding who was occupying the Building prior to Leander's acquisition of it in March 2008:

> Q: So when you visited the building, [d]id you ever see any other people in the building besides Mr. Hollingsworth?
>
> A: No.

Page 6 - OPINION AND ORDER

>Q: Did Mr. Hollingsworth ever tell you, prior to January 2008, that any other businesses were renting space within the building?
>
>A: No.
>
>Q: So prior to January 2008, there were no tenants in the building to your knowledge?
>
>A. No.  There's no tenants.
>
>Q: Okay.  It was just Mr. Hollingsworth?
>
>A: Yes . . .
>
>Q: At [that] time[,] did Mr. Hollingsworth still have an office contained within the building at 1390 Airport Way?
>
>A: He was set up there, yes, he was. But as soon as I took over, I told him he couldn't have it. . .
>
>Q: Was there anyone else as a tenant in the building at the end of December 2007 or at the beginning of January 2008?
>
>A: No tenants.
>
>Q: So no one else was in there except Mr. Hollingsworth?
>
>A: Exactly . . .
>
>Q: Now, at the time that the property was for sale -- and we are talking early 2008 . . . It was, for all intents and purposes, a vacant building.
>
>A: Yes.

Id. at *3-4; see also Am. Passmore Decl. Ex. A, at 10-12.

American also questioned Sparacino regarding who was occupying the Building and what it was being used for after Leander purchased it:

>Q: After Leander Land purchased the property, [d]id [Hollingsworth] help manage property?
>
>A: Yeah. But I didn't pay him.
>
>Q: Did he pay you -- did he pay you to use the property in any way?

Page 7 - OPINION AND ORDER

> A: No.
>
> Q: Was there ever an arrangement that he would pay rent to you or that rent would be forgiven because he was doing work on the property for you?
>
> A: No.
>
> Q: Do you know how often Mr. Hollingsworth went out to the property after Leander Land purchased it?
>
> A: On a regular basis . . . Couple of times a week.
>
> Q: Did he use the space for any of his own businesses?
>
> A: No.  Not after I purchased it . . .
>
> Q: Did he allow anybody else to conduct business on the site?
>
> A: No . . .
>
> Q: Did you ever see any other individuals at the property besides Mr. Hollingsworth?
>
> A: Let's see.  No . . .
>
> Q: When you went into the offices two weeks before the fire, [w]hy were there [three] computers in there?
>
> A: Well, they weren't set up . . . I had no internet or anything on them.
>
> Q: Were they just old computers?
>
> A: Not real old.  It was to make a good appearance when it sold.
>
> Q: [W]hen you bought the property from Exclusive Transport, did it come furnished with property?
>
> A: Yes, it did.

Leander, 2013 WL 1786348 at *4; see also Am. Passmore Decl. Ex. A, at 15-17.

In her April 2011 "Corrections to the EUO," Sparacino explained that she "did not understand" the meaning of the word tenant: "[a]fter my EUO, the word 'tenant' was explained to me as

Page 8 - OPINION AND ORDER

being anyone including companies who rent space . . . I believed it to be only people who rent apartments." Am. Passmore Decl. Ex. C, at 19. Pursuant to this clarification, Sparacino stated that "[t]here were a lot of other companies and people using the Office Building and the Storage Yard [such that the] building was not 'vacant'[;] it was being used and had a lot of furnishings." Id. at 12; see also id. at 14 (remarking that, in May 2008, Sparacino began using the Building as office space for Leander along with "15 or so . . . other Companies, [who had] month to month agreements with Exclusive Transport, Inc."). Accordingly, Sparacino indicated that she "did see a few other people" at the Building and that Hollingsworth "sometimes let the other companies using the Building and Yard in and out." Id. at 21.

During her September 2011 EUO, where she was again represented by counsel, Sparacino provided a list of 18 tenants that were allegedly in the Building prior to and throughout Leander's ownership. See Am. Passmore Decl. Ex. E. Sparacino testified further that Hollingsworth helped her prepare this list "pretty shortly after the fire" but before her April 2010 EUO. As such, Sparacino stated that, at the time of her April 2010 EUO, she understood that the recorded entities were tenants. Am. Passmore Decl. Ex. D, at 4-6.

Leander's June 2012 interrogatory response specified that there were only three "compan[ies], individual[s], and/or other entit[ies]" leasing the Building, all of whom allegedly shared the same square footage, during "the calendar year of 2009." Am.

Page 9 - OPINION AND ORDER

Passmore Decl. Ex. F, at 2-3. Two of these businesses, Leander and Exclusive Transport, Inc., were listed as tenants during Sparacino's September 2011 EUO; however, a third company, M.L. Sparacino, dba Sparacino, had not been previously identified. Compare id., with Am. Passmore Decl. Ex. E.

This Court previously found that Sparacino's April 2010 EUO "testimony reveals that the Building was vacant, as defined by the Policy, from at least January 2008 through the date of the Fire." Leander, 2013 WL 1786348 at *4. Further,

> Sparacino's subsequent statements do not offer elucidation or explanation but, instead, directly contradict her April 2010 testimony. Regardless of whether Sparacino misunderstood the term 'tenant,' her prior statements make clear that there were no other companies or individuals conducting business at the Building . . . Her April 2010 testimony also establishes that there were no other individuals at the site for any other purpose and, to the extent that the Building appeared to be operational office space, that was only because it was staged as such for resale[;] because Sparacino stated that her sole purpose in purchasing the Building was to resell it at a profit, it is unclear what 'customary operations,' if any, Leander was carrying out therein . . . Accordingly, the Court is unable to conclude that this is a case in which the deponent's memory could credibly have been refreshed by subsequent events, including discussions with others or her review of documents, records, or papers. This is especially true in light of Sparacino's September 2011 testimony that, at the time of her April 2010 deposition, she understood that the entities that were allegedly leasing space in the Building were tenants.

Id. at *6.

Thus, as American notes, the parties' prior proceedings demonstrate that Sparacino made misleading statements regarding Building vacancy. See Def.'s Mem. in Supp. of Second Mot. Summ. J. 17. Moreover, because Sparacino concealed and/or misreported

Page 10 - OPINION AND ORDER

whether and/or how many tenants were leasing space within the Building prior to the Fire, which directly related to how much, if any, coverage was available under the Policy, the misrepresentations are material. See Policy at 69 (where the insured property met the 60-day vacancy requirement prior to an intentionally ignited fire, coverage is reduced by 15%); see also Callaway v. Sublimity Ins. Co., 123 Or.App. 18, 23, 858 P.2d 888 (1993) (misrepresentations are "material" if they inhere "to a subject that was relevant and germane to the insurer's investigation as it was then proceeding") (citation and internal quotations omitted). The first element is therefore satisfied.

II. Made Knowingly or Recklessly

As discussed above, Sparacino gave three different answers, under oath, to the same question concerning whether the Building was vacant prior to the Fire; this Court previously held that Sparacino failed to provide an "explanation, reasonable or otherwise" for the "clear and unambiguous inconsistencies" between her representations concerning the Building's tenancy. Leander, 2013 WL 1786348 at *6 (citation and internal quotations omitted). From this, American infers that Sparacino's variable statements were careless, if not wilfully specious: "[t]his Court has already determined that Ms. Sparacino's subsequent changes to her testimony regarding the number of tenants in the building were not innocent mistakes [such that] summary judgment is appropriate because the material misrepresentations were made knowingly, recklessly without any knowledge as to whether the representation was true or false,

Page 11 - OPINION AND ORDER

or with reckless indifference to its truth or falsity." Def.'s Mem. in Supp. of Second Mot. Summ. J. 21.

The Court finds this argument and evidence sufficient to meet American's initial burden in demonstrating that Sparacino's material misrepresentations were, at least, made recklessly. See Kentner v. Gulf Ins. Co., 297 Or. 470, 476, 686 P.2d 339, modified on other grounds, 298 Or. 69, 689 P.2d 955 (1984) (the "misrepresentation [need not] be wilful in order for an insurance company to avoid a contract . . . [rather,] reckless indifference to its truth or falsity on the part of one making it" is adequate). Because Leander did not oppose American's motion, it is unclear what Sparacino's stance is as to these material misrepresentations - i.e. whether they were made knowingly, recklessly, inadvertently, or otherwise. Even assuming that Leander responded, the court notes that Sparacino's repeatedly conflicting statements, as well as the fact that she first denied understanding the word tenant as it was used during the April 2010 EUO and then later testified she comprehended that, at the time of the April 2010 EUO, the list of 18 entities allegedly leasing space in the Building were, in fact, tenants. Viewing the record in the light most favorable to Leander, the court questions whether reasonable minds could differ as to this issue. In any event, without any response from Leander, American's position is uncontravened. Accordingly, the second element is met.

III. Detrimental Reliance

Finally, the record demonstrates that "[d]ue to th[e]

Page 12 - OPINION AND ORDER

substantial changes [between Sparacino's April 2010 EUO, during which she endorsed that the Building was vacant, and her April 2011 "Corrections to the EUO," wherein she indicated that several tenants were leasing the Building prior to the Fire,] American Economy instructed [its counsel at] Bullivant Houser Bailey to take a second [EUO] of Ms. Sparacino, which occurred on September 9, 2011." Def.'s Mem. in Supp. of Second Mot. Summ. J. 22; see also Hinton Decl. ¶¶ 4-6. Costs from the second EUO, in the form of "billings from Bullivant Houser Bailey PC for its time and expense . . . as well as billings from the court reporter to attend and transcribe," exceeded $4,500. Hinton Decl. ¶ 7. Additionally, "the changes in Ms. Sparacino's sworn testimony took more [of the claim adjustor's] time and caused additional assignments to [the] Special Investigation Unit to conduct additional investigation." Id. at ¶ 8.

Thus, American carried its initial burden in establishing that it changed its position and/or detrimentally relied on Sparacino's material misrepresentations. See Eslamizar v. Am. States Ins. Co., 134 Or.App. 138, 146, 894 P.2d 1195, rev. denied, 322 Or. 228, 904 P.2d 1070 (1995) ("the term 'reliance,' as it is used in ORS 742.208(3), means ordinary reliance, which requires some evidence of a detrimental action or change in position[,] [such as] incurr[ing] additional expenses in conducting its investigation because of plaintiff's misrepresentation"); but see HTI Holdings, Inc. v. Hartford Cas. Ins. Co., 2011 WL 6205903, *9 (D.Or. Dec. 8, 2011) ("mere investigation expense is insufficient to establish

Page 13 - OPINION AND ORDER

reliance") (citing Breeden, 216 Fed. Appx. at 659-60).

Because it elected not to file an opposition, Leander does not challenge American's evidence or argue that factual questions exist. Accordingly, there are no disputed issues of material fact, such that the third element is fulfilled. Therefore, the Policy is void as a matter of law and American's motion is granted.

## CONCLUSION

American's second motion for summary judgment (doc. 27) is GRANTED and this case is DISMISSED. Accordingly, American's request for oral argument is DENIED as unnecessary.

IT IS SO ORDERED.
Dated this 1st of ~~October~~ Nov. 2013.

_____
Ann Aiken
United States District Judge